UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DOUGLAS F. MANN, Chapter 7
Trustee of Estate of Engstrom, Inc.,

    Appellant,

v.                                                                               Case No. 21-cv-1070-bhl

LSQ FUNDING GROUP, L.C.,

    Appellee.

---

## DECISION AND ORDER

---

      Trustee Douglas F. Mann appeals an August 31, 2021 bankruptcy court order granting summary judgment in favor of LSQ Funding Group L.C. (LSQ) on the Trustee's fraudulent conveyance and preference claims. *See Douglas F. Mann as Chapter 7 Trustee of the Estate of Engstrom, Inc. v. LSQ Funding Group, L.C.* (*In re Engstrom, Inc.*), Case No. 20-22839-kmp, Adversary No. 20-2062-kmp (Bankr. E.D. Wis. 2021). Because the bankruptcy court correctly applied the earmarking and diminution of the estate doctrines to dismiss the Trustee's adversary claims, the appeal fails and the bankruptcy court's decision is affirmed.

### FACTUAL AND PROCEDURAL BACKGROUND

      Before its April 2020 bankruptcy filing, Debtor Engstrom, Inc. was a temporary staffing agency. R. 4-4 at 68. It was, for several years prior to its bankruptcy, and until January 2020, party to a factoring agreement with LSQ. *Id*. at 77. Factoring, also known as accounts receivable or invoice financing, is an arrangement by which a business obtains credit based on funds the business expects to receive from its customers. *Id*. at 279. Engstrom entered into such an arrangement with LSQ.

      Under the parties' Invoice Purchase Agreement (IPA), Engstrom would issue invoices to its customers for temporary staffing services and then submit those invoices to LSQ for purchase. Upon acceptance, LSQ would advance Engstrom approximately 85% of the face amount of the purchased invoices. After LSQ received payment from Engstrom's customer, Engstrom would ask LSQ to forward the remainder of the face amount of the paid invoice, less the amounts owed

to LSQ under the IPA. *Id*. at 145-59. To secure its obligations, Engstrom granted LSQ a first priority security interest in all of its personal property and fixtures, and the proceeds thereof, including all accounts. *Id*. at 145, 151-59.

On January 9, 2020, LSQ terminated the IPA and demanded payment of the $10,272,501.68 then due from Engstrom. R. 4-4 at 68-69. LSQ also exercised its contractual right to require Engstrom to repurchase all unpaid and outstanding invoices. *Id*. at 146.

Two weeks later, on January 23, 2020, Engstrom entered into a new factoring agreement with Canfield Funding LLC, d/b/a Millennium Funding (Millennium). *Id*. at 280-81, 287-304. The Millennium Agreement "was designed to operate like a standard factoring agreement: once the Debtor submitted invoices to its customers and Millennium, Millennium would advance 85% of the face value of the invoices to the Debtor. After Millennium received payment directly from the Debtor's customers, it would advance the remaining 15%, less any fees set forth in the contract." *Id*. at 281.

On January 27, 2020, LSQ sent a payoff letter to Millennium and Cherie Campion, Engstrom's chief executive officer, confirming Engstrom's debt to LSQ was (as of the next day) $10,306,661.56. R. 4-4 at 19-20, 306-07. Millennium signed the letter, accepting its terms, and returned it to LSQ. *Id*. at 307. Two days later, on January 29, 2020, Millennium paid LSQ the $10,306,661.56 via wire transfer. *Id*. at 210. After receiving the payment, LSQ released all of its interests in Engstrom's invoices and other assets. *Id*. at 79.

As part of its deal with Millennium, Engstrom agreed that the funds being sent to LSQ could only be used to pay Engstrom's debt to LSQ; Engstrom had no discretion to transfer those funds to any other person or entity. R. 4-4 at 211-12, 218, 228. The transfer eliminated Engstrom's debt to LSQ, replacing it with a debt to Millennium. *Id*. at 211. In exchange, Millennium received a security interest in the collateral previously pledged to LSQ. *Id*. at 218. After the transaction, LSQ had no interest in Engstrom's accounts. *Id*. at 148, 183.

According to the Trustee, Millennium later discovered that Campion and Engstrom had perpetrated a fraud. Millennium received its first payment for invoices it purchased from Engstrom via a wire transfer from an account in the name of NextEra Renewable ES, LLC. R. 4-4 at 275. Millennium tried but was unable to verify that the payor was a legitimate subsidiary of NextEra, Inc., Engstrom's largest customer. *Id*. at 274-75, 282. It then discovered that the account signatory was actually *Campion* and that NextEra Renewable ES, LLC was not a legitimate NextEra

subsidiary. *Id*. at 282-83. When confronted, Campion admitted Engstrom actually had only about $12,000 in legitimate invoices. She further revealed she had created a fictional individual to verify the fraudulent invoices and had used voice-altering technology to appear as the fictional individual, with fraudulent phone and fax numbers. *Id*. at 275-76.

Millennium maintains that Engstrom and Campion were engaged in a fraudulent Ponzi scheme through which they sold fake invoices to Engstrom's factor and obtained advances that were then used to pay off previously purchased invoices. The downward debt spiral continued because Engstrom continually fell behind as its factor would never pay the entire face value of the invoices given the deduction of contractual factoring fees. R. 4-4 at 276.

On April 15, 2020, Engstrom filed a Chapter 11 bankruptcy petition. R. 4-2 at 1-31. Shortly thereafter, Engstrom filed an adversary proceeding against LSQ, contending the payment Millennium made to LSQ to pay off the Engstrom debt was a voidable preference. R. 4-4 at 1-3. The adversary complaint was later amended to add fraudulent transfer claims as well. R. 4-4 at 9-14; *see also* R. 4 at 44. LSQ and the United States Trustee filed separate motions to have: (1) the bankruptcy case dismissed; (2) a trustee appointed; or (3) the case converted to Chapter 7. With these motions pending, Engstrom stipulated to convert the case to Chapter 7. *See* R. 4 at 12, 23, 30. After a Chapter 7 Trustee was appointed, the Trustee obtained court permission to employ Engstrom's bankruptcy counsel to continue the adversary proceeding. *See id*. at 32, 36.

On March 25, 2021, LSQ moved for summary judgment on the Trustee's claims. R. 4-4 at 111-12. Five months later, on August 31, 2021, the bankruptcy court issued a decision and order granting LSQ's motion for summary judgment and dismissing the Trustee's claims. R. 4-6 at 22-61. In a detailed analysis, the bankruptcy court applied long-established Seventh Circuit law concerning the "earmarking" and "diminution of the estate" doctrines to conclude that Engstrom lacked an interest in the Millennium payment made to LSQ and that the payment had not diminished Engstrom's bankruptcy estate. Because the Trustee could therefore not establish an essential element of its avoidance claims, the bankruptcy court granted LSQ summary judgment.

## ANALYSIS

This Court has jurisdiction over the appeal of the bankruptcy court's order under 28 U.S.C. §158(a). The bankruptcy court's decision to grant summary judgment is reviewed *de novo*. *In re Midway Airlines, Inc.*, 383 F.3d 663, 668 (7th Cir. 2004). A grant of summary judgment will be affirmed if "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be affirmed on any ground supported by the record, even if it was not relied upon by the court below. *Midway Airlines*, 383 F.3d at 668.

The Trustee asserts the bankruptcy court's summary judgment decision should be reversed for four reasons. First, the Trustee contends the bankruptcy court erred in refusing to allow equitable considerations, specifically LSQ's alleged "unclean hands," to override the court's application of the earmarking doctrine. Second, the Trustee insists the bankruptcy court mistakenly applied the earmarking doctrine to a factoring relationship. Third, the Trustee challenges the bankruptcy court's conclusion that the Debtor's estate was not diminished by the Millennium payment. Fourth, and finally, the Trustee argues the bankruptcy court should not have applied either the earmarking or diminution of the estate doctrines to the Trustee's fraudulent transfer claims. As explained below, the bankruptcy court correctly applied the law, and its decision will therefore be affirmed.

**I.    The Bankruptcy Court Did Not Err in Refusing to Use Equitable Considerations to Override the Earmarking Doctrine.**

The Trustee's lead argument is that the bankruptcy court erred in rejecting the Trustee's invitation to use equitable considerations to cancel out application of the earmarking doctrine. ECF No. 6 at 23-31. According to the Trustee, LSQ possessed unclean hands—or, at minimum, there is a genuine dispute as to LSQ's inequitable conduct—making summary judgment on its avoidance claims inappropriate. *Id*. at 24.

The Trustee's argument fails to understand the bankruptcy court's analysis. The bankruptcy court was well aware of the Trustee's (and Millennium's) position that Engstrom's debts to both LSQ and Millennium were the result of a fraudulent scheme perpetrated by Engstrom and its CEO, Campion. R. 4-6 at 27, 42. The court also understood that the challenged payment—from Millennium to LSQ on the debtor's behalf—left Millennium (rather than LSQ) holding the bag for the scheme. *Id*. But the bankruptcy court correctly concluded that this scheme was legally irrelevant under the Bankruptcy Code provisions applicable to the Trustee's claims. *Id*. at 42-43.

The Trustee brings avoidance claims under section 547(b) (preferences), section 548(a)(1) (fraudulent transfers and obligations), and section 544(b) (avoiding certain prepetition transfers). As applicable to this adversary proceeding, all three sections require proof of a "transfer of an

interest of the debtor in property." Absent such a transfer, the Trustee's claims under these sections fail. *See* 5 Collier on Bankruptcy ¶¶544.01, 547.03[1], 548.03[2] (16th ed. 2022).

As the bankruptcy court explained, the earmarking doctrine is a well-established legal principle that confirms that certain transactions do not involve transfers of a debtor's interest in property. Specifically, the doctrine confirms that when a new lender makes a loan to a debtor for the specific purpose of paying off a former lender, the debtor has not made a transfer of its own property because the debtor still owes the same sum, only to a different creditor. *See* 5 Collier on Bankruptcy ¶547.03[2][a]. In the words of the bankruptcy court: "'In such circumstances the payment is 'earmarked' and the third party simply substitutes itself for the original creditor. Such a transfer is said not to be a preferential transfer because (1) the debtor never exercises 'control' over the new funds; and (2) the debtor's property (i.e., the fund out of which creditors can be paid) is not diminished.'" R. 4-6 at 31 (quoting *In re Smith*, 966 F.2d 1527, 1533 (7th Cir. 1992)).

The bankruptcy court correctly observed that there is no dispute that Millennium paid LSQ to satisfy an antecedent debt, Engstrom had not exercised any "control" over the transferred funds, and the transaction had no effect or "diminution" on Engstrom's bankruptcy. R. 4-6 at 33. Accordingly, the earmarking doctrine applied to except the Millennium payment from Engstrom's bankruptcy estate.

Because Engstrom never had an interest in those funds, the bankruptcy court was correct in concluding that the funds were not subject to the Trustee's avoidance claims and this conclusion remains valid irrespective of any underlying fraud by Engstrom and Campion. If the debtor had no interest in the transferred property, then alleged inequitable conduct by the transferee related to that property is irrelevant. The Trustee cites no caselaw in which a court has used "unclean hands" or any other equitable principle to allow avoidance of a transfer in which the debtors lack an interest in the transferred property.

Neither the Trustee's lengthy discussion of the earmarking doctrine's history nor his plaintive cries for equity alters the fundamental point that Engstrom never had an interest in the Millennium payment. ECF No. 6 at 26-31. Anything questionable in LSQ's interactions with Millennium is a matter between those creditors and any such allegations have no bearing on

Engstrom's bankruptcy estate.[1]  In sum, there is nothing legally incorrect, or inequitable, about the bankruptcy court's application of the plain terms of sections 544, 547, and 548 and the earmarking doctrine to reject the Trustee's avoidance claims.

**II.     The Trustee's Tardy Assertion that the Earmarking Doctrine Does Not Apply to Factoring Transactions Is Not Timely Raised and, in Any Event, Is Legally Wrong.**

The Trustee next argues the bankruptcy court should not have applied the earmarking doctrine at all because Millennium's payment involved the payoff of a factoring transaction. ECF No. 6 at 32-36.  The Trustee urges the Court to adopt a rule limiting application of the doctrine to "typical loan transactions" and reject its application to factoring arrangements like the one at issue here.  *Id*. at 33.  According to the Trustee, the bankruptcy court failed to account for the fact that Engstrom sold its accounts receivable to LSQ only to have LSQ demand that Engstrom repurchase those accounts receivable when it terminated the parties' agreement.  The Trustee criticizes the bankruptcy court for improperly focusing on the wire transfer from Millennium to LSQ, when the $10,306,661.56 in essence represented proceeds from Engstrom's sale of its accounts receivable to Millennium.  *Id*. at 34-35.  It insists that "[a]lthough the Bankruptcy Court acknowledged the purchase and sale of the accounts, it did not consider their import in connection with the application of the earmarking doctrine.  Had it done so, it would have concluded that the Debtor necessarily had an interest in the $10.3 million paid to LSQ in order to repurchase the accounts receivable." ECF No. 8 at 16.

LSQ's first response to this diatribe is procedural.  LSQ objects that the Trustee did not argue in the bankruptcy court that the underlying factoring arrangement made the earmarking doctrine inapplicable and, accordingly, cannot pursue this position on appeal.  ECF No. 7 at 46-48.  It points to repeated concessions by the Trustee that the payoff was a loan—both in discovery responses and briefing—without ever suggesting that the factoring arrangement made the payoff anything other than a loan transaction. ECF No. 7 at 47 (citing Trustee Resp., R 4-4 at 410 (arguing Debtor "controlled the proceeds of the loan"); Wronski Decl., Ex. B, R 4-4 at 219 & 225, Resp. to Interrog. No. 7 (answering "Millennium transferred $10,306,661.56 to LSQ on behalf of the

---

[1]   The Court does not rule on any non-bankruptcy remedy Millennium may have against LSQ for any misrepresentations it made relating to the Engstrom/Campion fraud and the payoff transaction.  The Trustee's brief suggests LSQ actually remained silent and made no representations to Millennium concerning its exit from the Engstrom factoring relationship.  Regardless, whether Millennium's misfortune was the result of its own poor due diligence or fraud is not a matter for this bankruptcy case.

Debtor" and "[t]hose funds represented a loan from Millennium to the Debtor") & Resp. to Req. for Admis. No. 3 ("Plaintiff admits that the wire transfer of $10,306,661.56 that LSQ received on January 29, 2020 originated from an account owned or controlled by Millennium. By way of further response, the wire transfer to LSQ represented the proceeds of a loan between Millennium and the Debtor.")).

Normally "a party waives the ability to make a specific argument for the first time on appeal when the party failed to present that specific argument to the [bankruptcy] court, even though the issue may have been before the [bankruptcy] court in more general terms." *Homoky v. Ogden*, 816 F.3d 448, 455 (7th Cir. 2016) (citation omitted). An appellate court has "the discretion to take up these issues in the first instance, 'but to say that an appellate court *may* address an issue that was forfeited in the district court is not to say that it *must*.'" *Soo Line R.R. Co. v. Consol. Rail Corp.*, 965 F.3d 596, 601 (7th Cir. 2020) (citing *Singleton v. Wulff*, 428 U.S. 106, 121 (1976); quoting *Builders NAB LLC v. FDIC*, 922 F.3d 775, 778 (7th Cir. 2019)).

Here, the Trustee is trying to advance a new position on appeal. He points to nothing in the record showing he ever suggested to the bankruptcy court that it should create a factoring exception to the earmarking doctrine. In reply, he admits he referred to the payoff as a loan "at times." ECF No. 8 at 14. But he insists the factoring arrangement was no secret in the bankruptcy court. *Id*. This reply misses the point. That no one disputed the existence of a factoring arrangement before the bankruptcy court is not the same as arguing, as the Trustee does on appeal, that the earmarking doctrine does not apply at all to factoring arrangements. The argument is therefore waived.

For the avoidance of doubt, however, even in the absence of waiver, the Court agrees with LSQ that the earmarking doctrine applies in the context of factoring arrangements. As explained by the bankruptcy court:

> On January 29, 2020, LSQ received a wire transfer in the amount of $10,306,661.56 from an account owned or controlled by Millennium. Upon receipt of the payment from Millennium, LSQ released all of its interest in the Debtor's invoices and other assets. The Debtor had no discretion to transfer the funds that LSQ received on January 29, 2020 to any person or entity other than LSQ. The Debtor and Millennium had an agreement whereby the funds that Millennium sent to LSQ by wire transfer would be used only to pay the debt that the Debtor owed to LSQ. After the transfer, the Debtor no longer owed a debt to LSQ but was indebted to Millennium in an amount not less than $10,306,661.56. Millennium received as

> collateral the collateral that had previously secured the Debtor's debt to LSQ. After the transaction, LSQ no longer had an interest in the Debtor's accounts.

R. 4-6 at 26-27 (internal citation omitted). This is a textbook application of the earmarking doctrine. Simply because the financial transaction at issue was born of a factoring agreement instead of a more conventional loan does not change the analysis.

### III. The Bankruptcy Court's Diminishment of the Estate Analysis Was Not Erroneous.

The Trustee's third argument is that the bankruptcy court incorrectly concluded that the Debtor's bankruptcy estate was not diminished by the transfer, based on the court's error in "casting this transaction in terms of a routine loan refinancing, instead of a factoring arrangement." ECF No. 6 at 36-39. Had the bankruptcy court considered the transaction under factoring principles, the Trustee contends, it would have concluded that the estate was diminished because (1) the Millennium Agreement imposed a higher base factoring fee than the LSQ Agreement, (2) the Millennium Agreement imposed an additional concentration factoring fee over eight times the cost of LSQ's base factoring fee, and (3) the payoff to LSQ also included LSQ's factoring fee, resulting in a "second factoring fee" applied against the purchased invoices. *Id*. at 37-39.

This Court disagrees. Applying the underlying principles set forth by the Seventh Circuit in *Smith*, 966 F.2d 1527, the Bankruptcy Court explained its reasoning:

> Before the wire transfer, the Debtor owed LSQ $10,306,661.56 and had granted it a security interest in its accounts. After the wire transfer, the Debtor owed Millennium the same amount, $10,306,661.56 and had granted it a security interest in the same collateral. The transaction simply involved Millennium, as the new creditor, using its funds to step into the shoes of LSQ, as the old creditor, with no net impact on the estate. The new loan with Millennium did not deprive the Debtor's bankruptcy estate of something that could otherwise be used to satisfy the claims of its other creditors. The proceeds of this loan were not available for distribution to the Debtor's creditors. The Debtor had no ability or discretion to transfer the $10,306,661.56 wire transfer to any person or entity other than LSQ. Millennium was simply substituted for LSQ with respect to the debt the Debtor previously owed to LSQ. Had the transfer not been made, the Debtor's assets and total obligations would have remained exactly the same – only the identity of the Debtor's primary creditor would have changed.

R. 4-6 at 48. Again, this Court finds no error in the bankruptcy court's analysis.

The bankruptcy court correctly recognized that, while the Bankruptcy Code does not contain an explicit diminution of the estate requirement, courts—including the Seventh Circuit—require a plaintiff in an avoidance action to prove that the transfer resulted in diminution of the debtor's bankruptcy estate. R. 4-6 at 43 (citing *Smith*, 966 F.2d at 1535). The bankruptcy court

then analyzed the transaction at issue. It concluded that the challenged transaction did not result in a "diminution of the debtor's estate," based upon the following undisputed facts: (1) immediately before LSQ's receipt of the wire transfer of $10,306,661.56 on January 29, 2020, the Debtor was indebted to LSQ in an amount equal to $10,306,661.56; (2) immediately after LSQ's receipt of the wire transfer, the Debtor was no longer indebted to LSQ in any amount; (3) immediately after Millennium's initiation of the $10,306,661.56 wire transfer to LSQ, the Debtor was indebted to Millennium in the same amount; (4) the Debtor had no ability or discretion to transfer the $10,306,661.56 wire transfer to any person or entity other than LSQ; and (5) the collateral in which Millennium received a security interest from the Debtor to secure repayment of the $10,306,661.56 remitted to LSQ was the same collateral that secured repayment of the Debtor's obligations to LSQ before LSQ's receipt of the $10,306,661.56 wire transfer from Millennium. *Id*. at 47-48.

Finding that Millennium's payoff of the $10.3 million factoring agreement that the Debtor had with LSQ did not result in depletion or diminution of the Debtor's estate, the bankruptcy court concluded there had been no transfer of an interest of the debtor in property and, consequently, the transfer of funds from Millennium to LSQ was not avoidable. R. 4-6 at 49. The bankruptcy court rejected the Trustee's argument that the Debtor's estate was diminished when it entered into the Millennium Agreement, which purportedly imposed higher factoring fees than the LSQ Invoice Purchase Agreement. *Id*. at 49-52. Comparing the Debtor's pre-transfer property to its post-transfer property, the bankruptcy court found that none of the fees diminished the pool of assets available to creditors. *Id*. at 51. None of these findings or conclusions was in error.

### IV. The Bankruptcy Court Properly Concluded the Earmarking and Diminution of Estate Doctrines Applied to Claims Under 11 U.S.C. §548(a)(1)(A).

The Trustee's final argument is that the bankruptcy court erred when it applied the earmarking and diminution of the estate doctrines to intentionally fraudulent transfer claims under 11 U.S.C. §548(a)(1)(A). ECF No. 6 at 39-43. The Trustee contends that since diminution of the estate (the lack of which may justify application of the earmarking doctrine) is not an element of an intentionally fraudulent transfer, the bankruptcy court improperly required the Trustee prove an additional element (diminution of the estate) not otherwise required by statute. *Id*. at 41.

This Court rejects this argument too. The bankruptcy court correctly held that the "diminution of the estate doctrine" applied to intentionally fraudulent transfers under section 548.

R. 4-6 at 58-61. This section of the Bankruptcy Code allows a trustee to avoid "any transfer of an interest of the debtor in property" or any obligation incurred by the debtor that was made or incurred on or within two years of the date of the filing of the petition if the debtor voluntarily or involuntarily "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." 11 U.S.C. §548(a)(1)(A). To prevail on a claim under section 548(a)(1), the Code explicitly requires the Trustee prove a "transfer ... of an interest [or obligation] of the debtor in property." There are no exceptions to this requirement. Therefore, as a matter of law, when a debtor does not have an interest in the property transferred—whether demonstrated by the earmarking doctrine, diminution of the estate doctrine, or otherwise—there can be no fraudulent transfer claim. The bankruptcy court correctly applied the law.

## CONCLUSION

In sum, the Court agrees with and adopts the reasoning and analysis of the bankruptcy court as set forth in its August 31, 2021 decision. For the reasons stated above, the Order and Judgment of the Bankruptcy Court Granting LSQ Funding Group, L.C.'s Motion for Summary Judgment in *Douglas F. Mann as Chapter 7 Trustee of the Estate of Engstrom, Inc. v. LSQ Funding Group, L.C.*, Adversary No. 20-2062-kmp, are AFFIRMED.

Dated at Milwaukee, Wisconsin on July 15, 2022.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge